IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| KPM INVESTMENT O, LLC, *et al.*,[1] | Case No. 24-53073-PWB |
| Debtors. | (Jointly Administered) |

### LENDER'S OBJECTION TO DEBTORS' DISCLOSURE STATEMENT

Secured creditor Wilmington Trust, National Association, as Trustee for the Benefit of the Holders of Corevest American Finance 2021-2 Trust Mortgage Pass-Through Certificates ("Lender"), by and through its undersigned counsel, hereby objects (this "Objection") to the *Debtors' Motion for the Entry of an Order (A) Approving the Disclosure Statement, (B) Setting Deadline for Submitting Ballots and Objections to the Debtors' Joint Plan of Reorganization, and (C) Fixing the Date, Time, and Place for the Hearing on Confirmation of the Plan* [ECF No. 91] (the "Motion") which seeks approval of the *Disclosure Statement* [ECF No. 89] (the "Disclosure Statement") for the *Joint Plan of Reorganization Proposed By KPM Investment O, LLC and KPM Investment B, LLC* [ECF No. 90] (the "Plan") and certain related solicitation and confirmation procedures.[2]

### Introduction

On May 1, 2024, Lender filed a motion to dismiss Debtors' chapter 11 cases or, in the alternative, for relief from the automatic stay to continue state court proceedings seeking a receiver for Debtors' Properties. *See* ECF No. 68 (the "Motion to Dismiss"). Amongst other bases, the

---

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: KPM Investment O, LLC (6999) and KPM Investment B, LLC (0596) (collectively, "Debtors").

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Disclosure Statement.

615417371                                    1

Motion to Dismiss is grounded on Debtors' lack of any realistic prospect of effective reorganization. *Id.* at 19-21. On the same date, the Court held a hearing to consider Debtors' request to use cash collateral. At that hearing, the Court indicated that it would allow Debtors an opportunity to propose a plan before it would consider the Motion to Dismiss, and required Debtors to do so by June 24, 2024. *See* ECF No. 80 at 4. Debtors filed the Plan and accompanying Disclosure Statement at that deadline. Yet as Lender predicted in the Motion to Dismiss, the Plan proposed by Debtors cannot be confirmed, and the Disclosure Statement is inadequate. The instant Motion must therefore be denied.

The Disclosure Statement is insufficient in many respects and fails to provide creditors accurate and complete information necessary for them to make a fully informed decision whether to accept or reject the Plan. Indeed, the inaccuracies and incomplete information contained in the Plan disclosures are best exemplified by the first paragraph of the Plan itself, which states that the Plan will be funded "from [Debtors'] future income derived from their business relating to the manufacturing of certain machinery for nonwoven materials." ECF No. 90 at 2. Upon information and belief, Debtors have no businesses manufacturing machinery. This error, however, is emblematic of Debtors' slipshod description of its Plan and the facts relevant to Debtors' ability, or lack thereof, to implement the Plan. Nor is it the only material misstatement in the proposed disclosure materials. *See, e.g.,* ECF No. 89 at 6 (stating that "the Debtors seek substantive consolidation of the *four* separate corporate Debtors") (emphasis added).

More acutely, the Disclosure Statement fails to provide impaired creditors sufficient information concerning: (a) Debtors' assertions regarding the occupancy rates of the Properties, which appear based on the number of units currently rentable to the public, and does not include units that cannot be rented out because of damage; (b) Debtors' assumption that it will be able to

reach 97% occupancy, especially given that the Plan does not describe how Debtors anticipate reaching this occupancy level or describe why Debtors were unable to obtain that occupancy level pre-filing; and (c) material risks to Debtors' ability to confirm the Plan, such as the fact that secured creditors are not being provided the equivalent value of their claim as of the Petition Date, and therefore, the consent of secured creditors will be required to confirm the Plan.

Based on these deficiencies alone, the Plan is unable to be confirmable as a matter of law. That, however, is a matter for another day. For present purposes, because the Disclosure Statement fails to fully and accurately explain the relevant facts and allow impaired creditors to make an informed decision when voting on the Plan it cannot be approved, and the Motion must be denied.

## Argument

The primary purpose of a disclosure statement is to give creditors the information necessary to determine whether to accept the debtor's plan. *See* 11 U.S.C. § 1125(a)(1). A proper disclosure statement is critical for creditors and the Court to determine whether a debtor's proposed reorganization is viable and whether such proposal should be supported or rejected. *See Matter of Freedom Ford, Inc.*, 140 B.R. 585, 588 (Bankr. M.D. Fla. 1992) (noting that "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the Court" in considering whether a debtor was estopped from bringing claims that were not disclosed in its disclosure statement) *quoting Oneida Motor Freight v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988). In addition, a disclosure statement that supports an unconfirmable plan should not be approved as it would result in "a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *see also In re Barakat*, 173 B.R. 672, 682 (Bankr. C.D. Cal. 1994) ("Because the debtor cannot propose a confirmable plan, the Court finds that the debtor has not [established] . . .

that there [will] be a probable reorganization within the foreseeable future. For that reason, the Court declines to conditionally approve the disclosure statement and grants relief from the automatic stay.").

Here, Debtors' Disclosure Statement is insufficient for numerous reasons, including because (1) it does not adequately disclose where the funding for the Plan will come from; (2) Debtors' Plan does not sufficiently inform impaired creditors that its Plan relies on obtaining 97% occupancy, which would also include the unrentable units that are not currently included in Debtors' occupancy calculation; and (3) the Disclosure Statement does not disclose material risks to the Plan, such as the fact that secured creditors will need to agree to Debtors' proposed Plan treatment since the Plan fails to provide equivalent value to secured creditors as of the Petition Date.

> **I.** **The Disclosure Statement Fails to Adequately Describe How a Plan Will Be Funded.**

As a threshold matter, the Disclosure Statement is insufficient because it does not provide sufficient information concerning the funding that Debtors will require to effectuate the Plan. In its Disclosure Statement, Debtors only identify "profits of the [Debtors'] business operations" for the funding on their proposed Plain. *See* ECF No. 89 at 16. However, Debtors also state that they did not have sufficient funding pre-petition both to pay creditors and make repairs at the subject Properties. *See* ECF No. 89 at 5 ("Corvest required half a million dollars to reinstate the loan, which neither Debtor was capable of paying while also renovating and repairing the Properties."). Debtors do not explain why the profits from the Properties were seemingly insufficient to make required repairs pre-petition but are somehow sufficient to make such repairs now. Further, Debtors' projections appear not to provide any line items for repairing and renovating units that are currently offline. Instead, the projections merely list line items for maintenance salaries and

615417371                                                                  4

for "Maintenance Supply." *See* ECF No. 89 at 22-23. Neither of these line items, nor any other line item contained in Debtors' projections, appear to include the cost necessary to repair and renovate units that are currently unrentable, much less contemplate expenditures for any major repairs that may be required post-effective date. *Id.* Debtors, therefore, should be required to (i) explain how they expect revenue to be sufficient to pay creditors and make required repairs at the Properties post-confirmation, and (ii) describe what change in circumstances would allow them to make (or prevent them from making) such payments from the revenue generated from the Properties. Such disclosure is particularly important given that Debtor's pre-petition revenue was insufficient to pay the amounts owed to creditors, to make required repairs and to maintain the Properties. Thus, additional disclosures concerning the Debtors' funding for the Plan is necessary in order to provide creditors sufficient information to weigh the feasibility of the Plan.

II. **The Disclosure Statement Fails to Provide Accurate Facts Concerning Debtors' Condition.**

The Disclosure Statement is also insufficient because its discussion of the occupancy rate of Debtors' Properties is misleading since it appears based on the rate of currently-rentable units and not the total number of units at the Properties. In the Disclosure Statement, Debtors state that pre-petition, and prior to the COVID-19 pandemic, the Properties were 90% occupied. ECF No. 89 at 5. Debtors notably do not disclose the current occupancy rate of the Properties in the Disclosure Statement. *See generally* ECF No. 89. However, even Debtors' allegation that the Properties were 90% occupied is misleading because this "occupancy" rate is based on the number of units that were in sufficient condition to be rented out to the public, not the total number of units available. Indeed, the last rent roll provided to Lender demonstrates a true occupancy rate of approximately 54% as of April 30, 2024, including the non-rentable units.

Further, Debtors' projections assume an occupancy rate of 84% in January of 2025, and, additionally, assume that they will be able to increase occupancy to 97% by December of 2025. ECF No. 89 at 22. The Disclosure Statement, however, fails to disclose whether these "occupancy rates" are based on units that are currently-rentable to the public, or if they also include units which will require repairs and renovation to bring online. Indeed, the Disclosure Statement contains no facts identifying the number of units that still require repairs, nor how such repairs will be funded. Given that the Disclosure Statement does not sufficiently identify whether its projections rely on currently rentable units or are based on the assumption that currently unrentable units will be repaired, put onto the market, and rented, the Disclosure Statement does not provide sufficient facts to allow creditors to determine the reasonableness of its projections.

Finally, Debtors have not provided any information which would allow impaired creditors to investigate how Debtors propose increasing their alleged occupancy rate to 97%. By Debtors' own admission, its occupancy rate prior to the COVID-19 pandemic, which Debtors assert as the impetus of the filing of these bankruptcy cases, was approximately 90%. Debtors provide no explanation for how they anticipate increasing the occupancy rate of the Properties above what was seemingly Debtors' maximum occupancy rate pre-pandemic. Without this information, parties cannot evaluate how realistic Debtors' projections are or whether Debtors are likely to meet this goal. Given that Debtors' own projections show extremely thin margins, the likelihood that Debtors will be able to meet their projections is pivotal for parties to weigh the feasibility of the Plan. Thus, since Debtors have not provided sufficient disclosures concerning the occupancy rates for the Properties or their plans for increasing these occupancy rates, the Disclosure Statement does not contain sufficient facts and Debtors should be required to make additional disclosures.

**III.     The Disclosure Statement Fails to Disclose Material Risks to Debtors' Ability to Confirm the Plan.**

The Disclosure Statement also fails to provide adequate information to impaired creditors concerning the risks to confirmation. In particular, the Disclosure Statement does not disclose that secured creditors must accept their treatment under the terms of the Plan since it does not provide secured creditors the equivalent of the value of their claims as of the Petition Date. The Disclosure Statement and Plan similarly fail to provide any justification for delaying the Effective Date of the Plan for 150 *business* days after confirmation. To be confirmable, a secured creditor must either accept the Plan, or the Plan must provide, among other things, for: (1) fully reinstating the secured creditor's claim and paying past due amounts so the claim is no longer impaired; (2) providing for the sale of the collateral and providing that the secured creditors lien will attach to the proceeds; or (3) providing the secured creditor the "indubitable equivalent" of their claims as of the effective date of the plan. *See* 11 U.S.C. § 1124; 11 U.S.C. § 1129(b)(2)(A)(i)(II) and (iii). Here, Debtors' Plan does not provide for reinstating Lender's claim, but instead states that Lender will be provided payment over an extended 114-month period with interest accruing at the face rate of 4.98% *See* ECF No. 90 at 10. It likewise appears to provide for no payments to Lender in the 150 business days between confirmation and the Effective Date. Lender, being Debtors' principal secured creditor, does not consent this proposed treatment.

Absent Lender's consent, the Plan as proposed cannot be confirmed. The Plan does not fully reinstate Lender's claim nor pay past-due amounts. The Plan likewise does not provide for the sale of the Properties, which are Lender's collateral. And the Plan does not provide Lender the "indubitable equivalent" of its claims or payments totaling the allowed amount of its claim as of the effective date because it extends the maturity date of the loan *by nearly three years*. Given that Debtors do not intend (and apparently cannot) bring the obligations owed to Lender current,

Debtors essentially propose to extend the obligations of past due amounts as well and paying those amounts to Lender over the extended 114-month period. However, Eleventh Circuit precedent is clear that "the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of security and the risk of subsequent default" when determining whether a plan provides a secured creditor the "indubitable equivalent" of its secured claim. *United States v. Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983).

Debtors' proposal of paying Lender at the same interest rate, despite the increase in prevailing interest rates since the origination of the loan, and despite the increased risk of default associated with the extension of the loan term, is insufficient and constitutes a material risk to Debtors' ability to confirm the Plan. Such a proposal does not provide Lender the "indubitable equivalent" of Lender's claim under Eleventh Circuit precedent. Debtors do not disclose the risk of Lender, or other secured creditors, rejecting Debtors' proposed treatment under the Plan and do not inform parties-in-interest that Debtors will be unable to confirm the Plan absent the consent of secured creditors. This is particularly material given that Lender will not consent to the proposed treatment under the Plan. Therefore, the Disclosure Statement is insufficient and fails to disclose material risks to the confirmation of the Plan.

**Reservation of Rights**

Lender fully reserves all of its rights with respect to the Plan and Disclosure Statement, as either may be amended at any time, and specifically including the right to raise and assert additional objections to confirmation of the Plan. The omission of any objection to Plan confirmation or other issues relating to the Plan from this Objection is not intended, and shall not be construed, as a waiver of such objections or issues, which are fully reserved to be asserted in connection with any solicitation and confirmation procedures the Court may establish.

**Request to Set Hearing on the Motion to Dismiss**

In the event Debtors cure the Disclosure Statement's numerous deficiencies and are permitted to pursue confirmation of the Plan, Lender respectfully requests that the Motion to Dismiss be set for hearing at the same time the Court considers confirmation (*i.e*., the "Confirmation Hearing"). Concurrent hearings on the Motion to Dismiss and Plan confirmation at any Confirmation Hearing will be an efficient use of Court and estate resources. Likewise in the event the Court denies confirmation of the Plan (which it should), immediate dismissal of these cases or relief from the automatic stay will be appropriate.

**Conclusion**

In sum, Lender objects to the approval of the Disclosure Statement because Debtors have provided insufficient disclosures concerning the funding of the Plan, their ability to make necessary repairs, or their proposal for increasing the occupancy rate for the Properties to meet their 97% occupancy projections. Further, approval of the Disclosure Statement should be denied because it is wasteful to proceed with solicitation of a facially unconfirmable Plan. Lender, therefore, requests that the Court deny approval of the Disclosure Statement.

Respectfully submitted, this July 25, 2024.

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Jarret P. Hitchings*
Jarret P. Hitchings (Admitted *pro hac vice*)
One Wells Fargo Center
301 South College Street, Suite 2150
Charlotte, North Carolina 28202
Telephone: (704) 749-8965
Facsimile: (704) 749-8990
Email: jarret.hitchings@bclplaw.com

-and-

Christian J. Bromley (Georgia Bar No. 206633)
1201 W. Peachtree Street, 14th Floor
Atlanta, Georgia 30309
Telephone: (404) 572-6600
Facsimile: (404) 572-6999
Email: christian.bromley@bclplaw.com

*Counsel to Wilmington Trust, National Association, as Trustee for the Benefit of the Holders of Corevest American Finance 2021-2 Trust Mortgage Pass-Through Certificates*

615417371                                              10

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| KPM INVESTMENT O, LLC, *et al.*,[1] | Case No. 24-53073-PWB |
| Debtors. | (Jointly Administered) |

**CERTIFICATE OF SERVICE**

This is to certify that on July 25, 2024, I electronically filed the foregoing **Objection to Debtors' Disclosure Statement** using the Court's CM/ECF filing system, which generated an email notice of the filing, linked to this document, to those parties who receive electronic notices in this case.

Dated: July 25, 2024

        **BRYAN CAVE LEIGHTON PAISNER LLP**

        */s/ Jarret P. Hitchings*
        Jarret P. Hitchings (Admitted *pro hac vice*)
        One Wells Fargo Center
        301 South College Street, Suite 2150
        Charlotte, North Carolina 28202
        Telephone: (704) 749-8965
        Facsimile: (704) 749-8990
        Email: jarret.hitchings@bclplaw.com

        -and-

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: KPM Investment O, LLC (6999) and KPM Investment B, LLC (0596).

Christian J. Bromley (Georgia Bar No. 206633)
1201 W. Peachtree Street, 14th Floor
Atlanta, Georgia 30309
Telephone: (404) 572-6600
Facsimile: (404) 572-6999
Email: christian.bromley@bclplaw.com

*Counsel to Wilmington Trust, National Association, as Trustee for the Benefit of the Holders of Corevest American Finance 2021-2 Trust Mortgage Pass-Through Certificates*

615417371

12